| | | | |
|---|---|---|---|
| JAMAL SHARIF (A-88447), | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. 12 C 5685 | |
| v. | ) | | |
| | ) | Judge Sara L. Ellis | |
| IMHOTEP CARTER, M.D., ROYCE | ) | | |
| BROWN-REED, KEVIN HALLORAN, | ) | | |
| MARCUS HARDY, DARRYL EDWARDS, | ) | | |
| and WEXFORD HEALTH SOURCES, INC., | ) | | |
| a corporation, | ) | | |
| | ) | | |
| Defendants. | ) | | |

## OPINION AND ORDER

Plaintiff Jamal Sharif, an inmate at Stateville Correctional Center ("Stateville"), fractured his right ankle while playing basketball on October 6, 2011. He filed this 42 U.S.C. § 1983 suit against Defendants Dr. Imhotep Carter, Kevin Halloran, and Wexford Health Sources, Inc. ("Wexford," and collectively with Dr. Carter and Halloran, the "Wexford Defendants") and Royce Brown-Reed, Marcus Hardy, and Darryl Edwards (collectively, the "IDOC Defendants"), alleging that the Wexford and IDOC Defendants exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment. Both the Wexford and IDOC Defendants seek summary judgment on Sharif's claims. Because Sharif cannot demonstrate that Dr. Carter, Halloran, Hardy, Edwards, or Brown-Reed acted with deliberate indifference to his ankle injury, the Court grants summary judgment for these Defendants. Similarly, because Sharif has not sufficiently established a question of fact as to whether Wexford's alleged cost-cutting policies and written policy for treating ankle fractures caused him harm, the Court grants summary judgment for Wexford.

# BACKGROUND[1]

Sharif challenges the medical care and treatment he received while an inmate at Stateville after injuring his ankle while playing basketball on October 6, 2011. Wexford, a private corporation, has a contract with the Illinois Department of Corrections ("IDOC") to provide medical services to inmates at IDOC facilities, including Stateville. Dr. Carter served as Stateville's medical director from July 25, 2011 to May 13, 2012. Halloran served as Wexford's chairman but has not and does not provide medical care to inmates. He has no involvement in medical decisions made for particular inmates, including those related to Sharif's care at Stateville.

Brown-Reed served as the health care unit administrator at Stateville at the relevant time. Although she oversaw all departments in the health care unit, she did not review or approve inmate treatment plans or conduct investigations into inmate complaints. She also had no involvement in the scheduling of medical care. She did not monitor or observe individual appointments of patients as the health care unit administrator, although she had done so previously as a nurse.

Hardy was the Stateville Warden between December 2009 and December 2012, with Edwards serving as the Assistant Warden of Programs between 2010 and August 2012. Hardy generally oversaw Stateville's population, safety, security, sanitation, and budget management.

---

[1] The facts in this section are derived from the Joint Statement of Undisputed Material Facts. The Court includes only those portions of the statements that are appropriately presented, supported, and relevant to the resolution of the pending motions for summary judgment. The Court takes all facts in the light most favorable to Sharif, the non-movant. Sharif also includes additional facts in his combined response to the motions for summary judgment, attaching exhibits in support of those facts. As discussed further below, the Court does not consider these additional facts, as they are not appropriately presented in accordance with the Court's summary judgment procedures.

## I.      General Provision of Medical Care at Stateville

Inmates request medical care by putting a sick call request in a box, speaking to correctional staff who then contact the emergency room, or speaking with medical technicians or nurses while they round through the housing units on a daily basis.  When inmates place sick call requests, the requests are logged by medical technicians in the inmate's medical chart and reviewed.  The medical technicians evaluate whether they can treat the issue or whether it needs referral to a physician.  If an inmate needs emergency care, a medical technician evaluates the inmate and sends the inmate to urgent care if needed.  If the issue is not an emergency, the inmate then must submit a sick call request.

Facility lockdowns do not prevent inmates from being seen at the health care unit in emergency situations.  But level-one lockdowns could result in inmates not receiving in-facility medical care for non-emergencies.  Facility lockdowns do not prevent inmates' outside referrals from taking place or security staff from taking inmates offsite for medical treatment, however.

Wexford's regional medical director testified that Wexford advises its employees to be cost conscious.  When hospital-based services, such as surgeries, exceed Wexford's annual hospitalization utilization threshold for a given year, Wexford must pay for the services rendered by independent practitioners.

## II.      Sharif's Ankle Injury and Treatment

Sharif injured his right ankle playing basketball on October 6, 2011.  Sharif claims he reported his injury to the inmate on cell house duty sometime between 2:00 p.m. and 3:00 p.m., asking him to contact the sergeant to have a medical technician look at the injury.  The inmate reportedly told Sharif that the sergeant told Sharif to be patient and that a nurse would attend to him, but no nurse or medical technician arrived.  Sharif has no reason to believe the inmate on

duty did not report the injury as reported, but he has no evidence that the injury was actually reported to the health care unit or a medical technician. Ultimately, around 5:00 p.m., Sharif went to the prison dining facility, where he reported his injury to Sergeant Baldwin. He was then taken to the health care unit's emergency room, where a nurse immediately treated him with crutches, a bag of ice, and a pass to return to the health care unit emergency room on October 10, 2011.

Sharif's pass to return to the emergency room on October 10 was canceled, and Sharif instead returned to the emergency room the following day. There, he waited in the waiting cell for five or six hours without being seen.[2] On October 12, Sharif had an x-ray on his right ankle, which revealed an undisplaced or non-displaced fracture of the right lateral malleolus. The x-ray request was signed in Dr. Carter's name, although Latanya Williams, the physician's assistant, requested it. In a non-displaced fracture, the bones line up. Conservative treatment, rather than surgery, is typically appropriate, with the fracture taking between six months and a year to heal on its own.

Dr. Schaefer, another doctor working in Stateville's health care unit, informed Sharif of his non-displaced fracture on October 14. Dr. Schaefer ordered Sharif to use crutches, have repeated x-rays, and take pain medication. He also provided Sharif with medical permits for a low bunk and low gallery. Dr. Carter testified that Dr. Schaefer's treatment decision was in line with medical standards. Sharif had a repeat x-ray on October 19, which reaffirmed the non-displaced fracture diagnosis. Dr. Carter reviewed these results and saw Sharif on October 24, concluding that Sharif had pain in his ankle. Sharif claims that Dr. Carter ordered an open-toe shoe and instructed Sharif to follow up in two weeks.

---

[2] Dr. Carter and Brown-Reed both testified that there was no reason why an inmate waiting in the holding cage would not be seen and receive treatment absent some emergency.

Around this time, Sharif claims to have spoken with Edwards regarding his ankle and to have made a request to be moved to a lower gallery, with the parties agreeing Sharif did not have a low gallery permit at the time he made the request. Edwards responded that he could move Sharif to F House, but Sharif testified that he did not want to go to F House because he thought it would involve the same issues of going up and down stairs as his current placement and housed mostly segregation inmates. Sharif also claims that he asked Edwards to help him see an outside foot specialist, but that Edwards responded that Sharif looked alright to him. Edwards does not recall any interactions with Sharif or investigating Sharif's medical treatment.

Sharif filed a grievance on October 21, complaining of deliberate withholding of serious medical needs, specifically that he had waited five or six hours without seeing a doctor, but he did not mention any of the named Defendants in his grievance or check the medical treatment box on the grievance form. The grievance office received the October 21 grievance on November 7, forwarded it to someone in the health care unit, and responded on December 7 that Sharif had received an x-ray on October 6.[3]

Sharif was next seen in the health care unit on November 4 by Dr. Dubrick. A follow up on November 15 was canceled because of a lockdown. On January 10, 2012, Dr. Carter saw Sharif, noting that Sharif had been "lost to follow-up," Doc. 160 ¶ 47, but that Sharif had good range of motion in his right ankle, no effusion, and that neurovascular function was preserved. Dr. Carter decided that Sharif's ankle had healed but ordered follow up x-rays for verification. Dr. Carter concluded that Sharif could return to full weight-bearing and so took away Sharif's crutches. Sharif testified that, in his view, Dr. Carter acted as he should up to January 10.

---

[3] The date of the x-ray included on the grievance response is incorrect, as Sharif actually received his first x-ray on October 12.

The x-rays taken on January 12 revealed that Sharif's ankle was still fractured. The radiologist's January 16 report indicated that there was no callous formation, or growth of new bone, so as to suggest healing. On January 20, Sharif saw Williams, who noted the x-ray results and scheduled a follow up for Sharif with Dr. Carter. Sharif claims that Brown-Reed was at this visit, but Brown-Reed has no recollection of this. Dr. Carter saw Sharif on January 25, informing him that the fracture remained non-displaced and that Dr. Carter would arrange for an appointment with a specialist. On February 1, Dr. Carter again saw Sharif, noting that he had not yet been seen by a specialist and that the fracture was not healing. No request for a referral appears in Sharif's medical records before this appointment. The orthopedic consult was approved in a collegial review on February 6. Once approved, Stateville's medical records director, Olayinka Olarewaju ("Ms. Yeku") scheduled the appointment with Hinsdale Orthopaedic. Wexford's policies provide that once collegial review approves an outside appointment, care should be initiated as soon as possible. Based on custom and practice, Ms. Yeku scheduled the appointment within five days of the date of approval, using a list of outside providers and reporting the basis for the referral and its urgency. The specialist then scheduled the appointment based on the provided information, choosing the date of the appointment.

On February 8, 2012, Sharif filed a grievance indicating he learned he had an appointment with an orthopedic specialist but that when staff came to get him, it did not happen. He asked for a rescheduled appointment, but he did not take issue with the conduct of any named Defendants in this case. On February 27, Sharif saw Dr. Carter, who informed him that the collegial review process had approved Sharif seeing a specialist. Sharif again filed a grievance on March 16, requesting a visit with an orthopedic specialist. On April 2, Sharif saw Dr. Puppala from the Hinsdale Orthopaedic Clinic, who recommended that Sharif have surgery on

his right ankle, which Dr. Puppala assessed to be an anatomic, non-displaced fracture. Although Sharif stated his pain at the time registered a nine out of ten, Dr. Puppala did not fully credit this rating. The Wexford Utilization Management team, along with Dr. Carter, approved the surgery on April 9. But when Ms. Yeku tried to schedule or confirm the surgery, Dr. Puppala asked for an additional appointment and x-rays before surgery. On June 5, this request was noted by the Wexford Utilization Management team, with Sharif thereafter approved for additional follow up and x-rays with Dr. Puppala.

Sharif claims he sent Halloran letters on April 20 and June 1, requesting right ankle surgery, and that he also wrote to Brown-Reed on April 20 and 29 regarding delays in his surgery. He also filed another grievance on April 22 concerning the IDOC van and step ladder used for transport, but this grievance related to issues surrounding his transportation to his April 2 appointment with Dr. Puppala. Sharif also claims to have written a letter to Hardy on May 10 asking for help in having his surgery sooner. Hardy does not know if he received the letter, as he does not keep a log of incoming mail and his assistant handles his mail, forwarding it to the appropriate department to handle. He also has no recollection of Sharif and knows nothing about his medical treatment. Similarly, Hardy does not recall ever reviewing any of Sharif's grievances.[4] Brown-Reed also has no recollection of Sharif and does not recall receiving any letters from him. She did not personally review letters sent to her by inmates, and letters from

---

[4] Although Hardy does not recall reviewing any grievances, the parties acknowledge in the joint statement of facts that one of Hardy's designee's, Keven Senor, signed off on Sharif's emergency grievance, which they state was dated May 22, 2012, finding it was not an emergency. The only emergency grievance found not to be an emergency signed by Marcus Hardy (or his designee) attached to the joint statement of facts is a March 16, 2012 grievance, signed by Hardy on March 26, 2012. *See* Doc. 160-17. Hardy also acknowledges that he concurred in the denial of one of Sharif's grievances on January 4, 2012, proof of which is attached to Sharif's second amended complaint. *See* Doc. 162 at 8 (acknowledging instance); Doc. 27-6 at 3 (grievance response).

inmates received by her office would be stamped. Neither of the letters Sharif claims to have

sent her have stamps on them from her office.

Dr. Carter left Stateville's employment on May 13. On June 3, Sharif filed another

grievance, complaining that Hardy and Edwards were delaying or failing to take action on his

ankle surgery. The grievance did not mention any of the Wexford Defendants. On June 5,

Sharif met with Dr. Puppala and recalls Dr. Puppala telling him that his initial surgery was

canceled and eventually rescheduled. Dr. Puppala noted that, upon examination, Sharif now had

a "healing fracture of the right lateral malleolus," meaning that he could "avoid surgery at this

time" as Sharif's "body is trying to heal this on its own." Doc. 160 ¶ 80. Dr. Puppala decided to

confirm healing through a CT scan, pursuing surgery only if the CT scan did not show healing.

Wexford approved the CT scan recommendation, which occurred on June 21. The CT scan did

not show the healing Dr. Puppala wanted. Wexford then approved a referral for surgery one day

after receiving the CT scan results. On July 13, Dr. Puppala performed the right ankle surgery,

specifically an open reduction and internal fixation of right distal fibula, at Silver Cross hospital.

The surgery required a bone marrow graft and insertion of a plate and six screws. Sharif then

spent two weeks in the health care unit's intensive care ward. Although Dr. Puppala

recommended a follow up visit within six weeks of the surgery, he did not see Sharif again. Dr.

Puppala also wrote Sharif a prescription for a bone stimulator but does not know whether Sharif

ever received the bone stimulator. Sharif filed a grievance to see Dr. Puppala and receive the

prescribed bone stimulation therapy after his surgery, but that grievance was denied. Sharif also

claims to have written Brown-Reed a letter on September 5, 2012 regarding not receiving bone

stimulation therapy, but he does not know if Brown-Reed received the letter.

Based on Hinsdale Orthopaedics' bills, it cost more money to send Sharif for additional follow up visits, x-rays, and the CT scan than it would have if Dr. Puppala had operated immediately after Sharif's first appointment with him. Dr. Puppala testified that his office had not yet been paid for Sharif's surgery.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

# ANALYSIS

## I.    Procedural Issues

### A.    Sharif's Fee Status

Before addressing the merits of Sharif's claims, the Court must address Sharif's *in forma pauperis* status.  Recently, it has come to the Court's attention that Sharif had accumulated three strikes under the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915(g), prior to the filing of this suit.  *See Sharif v. Jacob*, No. 17 C 5025, Doc. 4 (N.D. Ill. July 17, 2017) (detailing Sharif's litigation history, including the three cases dismissed as frivolous upon screening in 1993 and 1994 in the Southern District of Illinois).  Under § 1915(g), prisoners who have acquired three strikes cannot proceed with another action without prepaying the filing fee, unless they are in imminent danger of serious physical injury.  28 U.S.C. § 1915(g).  Additionally, an inmate is required to advise the Court that he has struck out, with the Court having the ability to dismiss the action as a sanction if the inmate fails to do so.  *See Isby v. Brown*, 856 F.3d 508, 519 (7th Cir. 2017) (collecting cases); *Ammons v. Gerlinger*, 547 F.3d 724, 725 (7th Cir. 2008) ("A litigant who knows that he has accumulated three or more frivolous suits or appeals must alert the court to that fact."); *Sloan v. Lesza*, 181 F.3d 857, 858–59 (7th Cir. 1999) (explaining that "fraud" on the Court must "lead to immediate termination of the suit").  Sharif's initial complaint was dated July 4, 2012, before he had ankle surgery.  Because the allegations of the complaint could be read to suggest a continuing need to address his ankle injury, the Court will not revoke Sharif's *in forma pauperis* status and instead will address the fully briefed summary judgment motion.  The Court does warn Sharif, however, that in future filings, he must disclose the fact that he has accumulated three or more strikes under § 1915(g) and cannot file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury.

His failure to disclose his litigation history, including his strikes, when he files a new federal lawsuit will result in immediate dismissal of the action with prejudice. *See Sloan*, 181 F.3d at 859.

### B. Adherence to the Court's Summary Judgment Procedures

Additionally, the Court must address Sharif's inclusion of additional facts in his response brief. The Court's summary judgment procedures differ from Local Rule 56.1, in that this Court requires the parties to submit a joint statement of undisputed facts. *See Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711–12 (7th Cir. 2015) (affirming this Court's summary judgment case management procedures). The party opposing summary judgment may, however, submit additional facts it contends demonstrate a genuine issue of material fact in its response, providing citations to supporting material. *Id.*; Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, http://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==. These additional facts must be genuinely disputed; the non-moving party may not use the response as an opportunity to sidestep the joint process. *See* Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice ("The parties may not file—and the Court will not consider—separate statements of undisputed facts."). Here, Sharif includes in his response his own narrative of facts, citing not only to the parties' joint statement but also to additional supporting material where his recitation of facts is not supported by the joint statement. The Wexford Defendants take issue with Sharif providing his own narrative, arguing that he has undermined the joint process. The Court agrees that, to the extent Sharif relies on undisputed facts, those facts should have been included in the joint statement of facts and so are not appropriately before the Court.

## II. Deliberate Indifference Claim

Correctional officials and health care providers may not act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both an objective and a subjective element: (1) the inmate must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). The parties do not dispute that Sharif suffered from an objectively serious medical condition for purposes of this motion, so the Court only addresses the subjective element of Sharif's deliberate indifference claim against each Defendant.

The subjective element of a deliberate indifference claim requires that the defendant act with a sufficiently culpable state of mind—"something akin to criminal recklessness"—requiring "that the defendant be aware of and disregard an excessive risk of serious harm to the inmate." *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006). "For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Holloway v. Del. County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)). Neither negligence nor gross negligence constitutes deliberate indifference. *Farmer*, 511 U.S. at 836.

## A.    Dr. Carter[5]

Sharif argues that Dr. Carter should be held liable because, on at least five occasions, his actions led to delays in the treatment of Sharif's ankle, unnecessarily prolonging Sharif's pain. The Court must consider Sharif's treatment as a whole instead of in pieces.  *See Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) ("We examine the totality of an inmate's medical care when determining whether prison officials have been deliberately indifferent to an inmate's serious medical needs.").  Looking at the totality of Sharif's treatment, the Court cannot conclude that Dr. Carter acted with deliberate indifference, where he initially pursued a conservative treatment for a non-displaced fracture and then, when it became clear Sharif's fracture was not healing, determined that he should refer Sharif to a specialist.[6]  *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (inmate not entitled to "demand specific care" or to "the best care possible," although he is "entitled to reasonable measures to meet a substantial risk of serious harm"); *Jackson*, 541 F.3d at 697 (because "[t]here is not one 'proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field . . . [a] medical professional's treatment decisions will be accorded deference unless no

---

[5] The Wexford Defendants argue that Sharif did not exhaust his administrative remedies before filing suit, but they fail to adequately develop this argument both factually and legally.  Because the Court will not research and develop the argument for the Wexford Defendants, the Court does not address the exhaustion defense further and instead focuses on the merits of Sharif's claims against the Wexford Defendants.  *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (the court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel").

[6] Aside from the delays with which he takes issue, Sharif also appears to contend that Dr. Carter exhibited deliberate indifference in failing to provide him with the bone stimulator that Dr. Puppala prescribed during Sharif's April 2 appointment.  Dr. Puppala's notes suggest he considered ordering a bone stimulator but noted that Sharif would "follow up at time of surgery."  Doc. 160-14 at 3.  Thus, Dr. Carter cannot be faulted for not following the instructions of a specialist where no specific instruction for a bone stimulator was made pre-surgery.  *See Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (doctor may be deliberately indifferent if "a doctor refuses to take instructions from a specialist").  Although Dr. Puppala did indicate that a bone stimulator would be ordered post-surgery, Dr. Carter cannot be faulted for failure to follow Dr. Puppala's recommendation post-surgery as he no longer worked at Wexford at that point. *See Walker v. Ghosh*, No. 13 C 1354, 2015 WL 1397982, at *5 (N.D. Ill. Mar. 25, 2015) (finding that Dr. Ghosh could not be held liable for conduct that occurred after he retired).

minimally competent professional would have so responded under those circumstances" (citations omitted) (internal quotation marks omitted)).

"To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730; *see also Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013) ("In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer verifying medical evidence that the delay (rather than the inmate's underlying condition) caused some degree of harm. That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." (citation omitted)). Although the Court has already concluded that Sharif's overall treatment by Dr. Carter meets constitutional standards, the Court addresses each alleged delay in turn.

First, Sharif complains that Dr. Carter did not examine him on October 11, when Sharif waited in the health care unit emergency room's waiting cell without being seen. Although Sharif was not seen on October 11, he had x-rays taken of his right ankle on October 12, after which Dr. Schaefer saw Sharif on October 14 to address the x-ray results and create a plan of treatment. Further, Sharif had already been seen for his ankle pain on the day of his injury, October 6, and had received crutches and ice at that time. Sharif does not present any evidence to suggest that his failure to be seen on October 11, by Dr. Carter or any other Stateville medical staff member, exacerbated his injury. *See Poff v. Schettle*, No. 15-CV-954-JPS, 2017 WL 2728430, at *7 (E.D. Wis. June 23, 2017) (dental services staff could not have been deliberately indifferent to conditions they did not know existed where plaintiff did not make them aware of pain he experienced that allegedly resulted from five-day delay in receiving dental treatment).

Next, Sharif contends that Dr. Carter exhibited deliberate indifference in failing to see him between October 24, 2011 and January 10, 2012. Although Dr. Carter's notes do indicate that Sharif had been "lost to follow-up," Doc. 160 ¶ 47, Sharif acknowledged that he did not have any issues with Dr. Carter's treatment through January 10, 2012, undermining any claim that this delay in appointments caused Sharif further pain. The Court also cannot give any weight to Sharif's mere speculation that additional appointments during this time period may have sped up the time frame in which he was referred to a specialist, particularly in light of Dr. Carter's conclusion on January 10 that Sharif's ankle had healed, pending x-ray confirmation, and the parties' agreed fact that, at the three-month mark (which coincided with the January appointment), the treating physician needed to see progression in healing based on x-rays to continue with a conservative treatment plan. With no indication that deviation from the conservative treatment plan would have occurred before the three-month mark or a suggestion that in the interim Sharif suffered additional harm absent additional visits with Dr. Carter, the Court cannot find this delay actionable.

Third, Sharif claims that Dr. Carter prolonged Sharif's pain by taking away Sharif's crutches on January 10, 2012, when he determined that Sharif's ankle had healed, and only returning them to Sharif on January 25, approximately two weeks later and after the x-ray showed that his ankle was still fractured. Sharif contends that there is a genuine issue of dispute as to whether Dr. Carter actually believed that Sharif's ankle had healed on January 10, but he presents no evidence to call Dr. Carter's judgment into question, instead agreeing that Dr. Carter's treatment up to January 10 was appropriate. Moreover, Sharif does not present evidence that he requested crutches at any time between his January 10 appointment and his January 25 appointment with Dr. Carter. During that time, he had at least one appointment with Williams,

the physician's assistant, on January 20, at which point she told him his ankle remained fractured and he could have requested crutches, but did not. The evidence again does not create a question of fact as to whether an actionable delay occurred.

Finally, Sharif takes issue with the delay in presenting the request for a referral to Wexford's collegial review and between the approval of that referral and his appointment with the specialist and ultimately, surgery.[7] But Sharif provides no independent evidence, either through an expert or in his own medical records, to suggest that the delay in first presenting the request for a referral and later in his seeing the specialist and then having the surgery exacerbated his injury or unnecessarily prolonged his pain. *Cf. Petties*, 836 F.3d at 732–33 (evidence in record suggested that delay in seeing specialist had detrimental effect where specialist noted pain and gapping due to lack of immobilization). Indeed, the record does not include any verifying evidence suggesting that Sharif's ankle "would have healed better had he received [surgery] earlier." *Walker*, 2015 WL 1397982, at *6. Moreover, the record does not suggest that Dr. Carter was responsible for the delays in Sharif's outside consultations and ultimate surgery. *See Harvey v. Ghosh*, No. 11 C 6716, 2015 WL 8329876, at *5 (N.D. Ill. Dec. 9, 2015) (although delay in inmate receiving x-ray was "extraordinary," no evidence in record that doctor was responsible for delay or aware of it). Instead, the parties affirmatively agree that Dr. Carter had no responsibility for scheduling, with that left to the Stateville medical records director and the outside provider.

Ultimately, the Court does not find that Sharif has identified a material issue of fact as to his treatment by Dr. Carter and any of the identified alleged delays. Therefore, because Sharif

---

[7] Dr. Carter left Stateville on May 13, 2012. To the extent Sharif complains about delays after that date, those complaints are not properly directed against Dr. Carter, who had left Stateville prior to Sharif's follow up appointment with Dr. Puppala and cannot be held liable for any alleged failures in treatment after he no longer worked for Wexford at Stateville. *See Walker*, 2015 WL 1397982, at *5.

has not shown that Dr. Carter's treatment was inadequate so as to rise to the level of a constitutional violation, the Court grants summary judgment for Dr. Carter.

## B.     Halloran

Sharif brings a claim against Halloran, Wexford's chairman, even though Halloran was not personally involved in Sharif's medical care. He bases his claim on two letters he sent to Halloran on April 20 and June 1, 2012. Because § 1983 creates a cause of action based on personal liability and predicated upon fault, "to be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." *Pepper v. Vill. of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005) (citation omitted) (internal quotation marks omitted). For a supervisor like Halloran, this means that he must have known "about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye." *Arnett*, 658 F.3d at 757. "[A] prison official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996).

Sharif argues that summary judgment should be denied as to Halloran because he sent two letters to Halloran—on April 20 and June 1, 2012—describing how he badly fractured his ankle, had been waiting for surgery since then, and that delayed treatment only prolonged his pain.[8] Sharif argues that because he did not receive a response, a genuine issue of material fact exists as to whether Halloran ignored his condition. But here, there is no evidence in the record that Halloran received Sharif's letters so as to provide him with knowledge of Sharif's condition, warranting summary judgment for Halloran. Halloran avers that he did not receive the letter, with inmate letters instead directed to Wexford's risk management unit. He also testified that he

---

[8] Only the April 20, 2012 letter is in the record.

had no involvement in medical decisions made for particular inmates. *See Boyce v. Obaisi*, No. 13 C 5746, 2015 WL 5462137, at \*15 (N.D. Ill. Sept. 16, 2015) ("Wexford officials may depend on the health care staff at each facility to assess an inmate's needs and to provide appropriate care and treatment."). This evidence sufficiently establishes that Halloran had no knowledge of Sharif's complaints so as to be held liable for deliberate indifference to Sharif's medical needs. *See Keller v. Elyea*, 496 F. App'x 665, 667 (7th Cir. 2012) (upholding summary judgment where plaintiff did not produce evidence that doctor knew of alleged violations by treating medical staff or had reviewed plaintiff's letters, distinguishing *Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999), where supervisors acknowledged receiving plaintiff's complaint letters); *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (record demonstrated that defendant did not personally receive inmate correspondence related to grievances), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013); *Wilder v. Wexford Health Sources, Inc.*, No. 11 C 4109, 2015 WL 2208440, at \*12 (N.D. Ill. May 8, 2015) (granting summary judgment for Halloran where evidence established that Halloran did not know of plaintiff's complaint and had no responsibility for making or implementing medical policies). Thus, the Court grants summary judgment for Halloran.

## C. Wexford

Sharif next contends that Wexford maintains a policy that its physicians and other medical practitioners should be cost conscious in their treatment of inmates' medical needs, and that this policy caused the delay of Sharif's surgery and the denial of a bone stimulator for both pre- and post-surgery therapy. He also claims that Wexford's policy as to how to treat a fractured ankle does not take into account pain arising from a fractured ankle and how such pain should impact recommendations for surgery.

To prevail on his claim against Wexford, Sharif must show that Wexford has an official policy, pattern, or practice that caused a constitutional violation. *See Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016) (*Monell* liability "applies in § 1983 claims brought against private companies acting under color of state law"). Liability may be based on (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to constitute a custom or usage with the force of law; or (3) a constitutional injury caused by a person with final policy making authority. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000). The policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (citation omitted) (internal quotation marks omitted). Although the Court has found that Sharif has no claim against Dr. Carter, institutional liability may still be possible where the "institutional policies are themselves deliberately indifferent to the quality of care provided." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017). But the alleged failures in care must be caused by Wexford itself; Wexford cannot be held liable on a *respondeat superior* theory of liability for its employees' conduct. *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000).

Here, Sharif failed to include the support on which he relies for his claim against Wexford in the joint statement of undisputed facts, but the Court nonetheless briefly addresses it. Sharif bases his claim that Wexford had a cost conscious policy that harmed him on the fact that Dr. Puppala prescribed a bone stimulator that he never received, and that such therapy would,

according to Dr. Puppala, cost several thousand dollars.[9]  Sharif cannot use his isolated experience in not receiving a bone stimulator to support a policy claim against Wexford, as "[s]uch isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent" to Sharif's needs.  *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).  Additionally, the record does not include evidence to suggest to whom the failure to provide the bone stimulator can be attributed—Wexford, IDOC, or an outside provider.  Finally, the parties have agreed that it cost more to send Sharif back to Hinsdale Orthopaedics for additional follow up visits, x-rays, and a CT scan than it would have if Dr. Puppala proceeded directly to surgery, undercutting the existence of a cost-cutting policy.  Thus, Sharif cannot prevail on this aspect of his claim against Wexford.

Second, Sharif contends that Wexford's policy of caring for ankle dislocations and fractures, providing primarily for "[s]plint[ing], ic[ing], and elevat[ing]," does not appropriately address how an inmate's pain should impact the recommendation for treatment.[10]  *See* Doc. 175-3 at 15.  Sharif argues that the policy should have taken into account pain, where Dr. Puppala recommended Sharif receive surgery in part based on the pain he was experiencing.  *See Wilder*, 2015 WL 2208440, at *10–11 (finding that reasonable jury could find that policy that did not include instruction regarding inmate's pain as factor in whether patient should have surgery to repair hernias resulted in deliberate indifference to plaintiff).  But here, Sharif cannot connect the

---

[9] Wexford cannot reasonably dispute that Dr. Puppala testified that a bone stimulator would cost several thousand dollars, so this fact should have been included in the parties' joint statement.  Instead, the parties included in their joint statement information about the cost of sending Sharif to see Dr. Puppala, which appeared to address Sharif's previously-articulated theory that Wexford delayed his surgery because it cost too much, which he has now apparently abandoned.

[10] The Court again notes that because Sharif did not properly present the Wexford policy document to the Court, the Court could find that Sharif has no basis for this aspect of its claim against Wexford.  But the Court nonetheless proceeds to address the issue for purposes of completeness.

Wexford policy to any prolonged pain or delayed surgery, for he does not present evidence that the Wexford doctors in his case did not consider pain in treating his ankle or that they delayed referring him to a specialist based on Wexford's written policy.[11]  Instead, the evidence suggests that Wexford medical practitioners treated Sharif's ankle with more than just a splint, ice, and elevation, monitoring it with a number of x-rays, providing him with pain medication, and, when Dr. Carter determined that the fracture was not healing, referring him to a specialist for further treatment.  *Cf. Heard v. Ill. Dep't of Corr.*, No. 06 C 644, 2012 WL 832566, at *7 (N.D. Ill. Mar. 12, 2012) (denying summary judgment to Wexford based on hernia policy that did not take into account pain where there was sufficient evidence that doctor followed policy when he did not take into account surgeons' recommendation and did not authorize surgery).  Without such evidence, in his case or that of other inmates, Sharif cannot hold Wexford responsible for a constitutional violation based on its written policy for treating ankle fractures.  Thus, the Court grants judgment for Wexford on Sharif's deliberate indifference claim against it.

> ### D.      IDOC Defendants

Because the IDOC Defendants are not medical professionals responsible for administering medical care, they are entitled to rely on and defer to the judgment of medical professionals.  *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013); *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).  The IDOC Defendants may be found to have been deliberately indifferent to Sharif's medical needs, however, if they had actual knowledge or reason to believe that medical personnel were not treating or were mistreating Sharif.  *King*, 680 F.3d at 1018.

---

[11] Indeed, the policy manual notes that the "[c]linical pathways do not replace sound clinical judgment, nor are they intended to strictly apply to all patients."  Doc. 175-3 at 3.  It continues that "[t]he specific strategies and pathways presented in this manual provide a clinical management approach, but their application is a decision made by the practitioner accounting for individual circumstances."  *Id.*  This suggests that practitioners had leeway to consider, among other things, an inmate's pain when treating an ankle fracture, with the manual providing only guidelines for treatment.

## 1.     Hardy

The parties are at odds as to Hardy's awareness of Sharif's ankle injury and treatment. The only facts properly before the Court, as presented in the parties' joint statement of undisputed facts, indicate that Sharif wrote Hardy a letter on May 10, 2012 and that Hardy reviewed two grievances filed by Sharif in January and March 2012.[12]

Hardy signed off on the grievance officer's report that Sharif appeared to be receiving appropriate medical care at the time on January 4, 2012, and then determined that Sharif's March 16, 2012 grievance was not an emergency but rather should be submitted in the normal manner. Hardy's actions concerning the grievances cannot form the basis of a deliberate indifference claim, as "the alleged mishandling of [Sharif's] grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011). Hardy was also entitled to rely on the medical staff's judgment in signing off on the initial grievance. *See Adams v. Durai*, 153 F. App'x 972, 975 (7th Cir. 2005) ("An administrator does not become responsible for a doctor's exercise of medical judgment simply by virtue of reviewing an inmate grievance[.]"); *Greeno v. Daley*, 414 F.3d 645, 655–56 (7th Cir. 2005) (corrections complaint appeals examiner not deliberately indifferent where he reviewed complaints and verified with medical officials that inmate was receiving medical treatment).

Sharif also contends that he sent Hardy a letter in May 2012 requesting immediate attention to scheduling his ankle surgery. As discussed above, an inmate's letter may be enough to put a prison official on notice of conditions requiring the official to take action to rectify

---

[12] Sharif also refers to a February 2012 grievance he filed, which Hardy reviewed in October 2012. But because Sharif only presented this grievance in his response, and not in the joint statement, and the fact of the response cannot genuinely be disputed, the Court does not consider it here. Additionally, citing to his own deposition testimony, Sharif claims that Hardy spoke with Sharif in his cell about Sharif's ankle swelling, with Hardy writing down Sharif's name and recommending that Sharif receive treatment. Again, because this could have been presented in the joint statement of facts, the Court does not consider it here.

problematic conduct.  *See Vance*, 97 F.3d at 993.  But here, Hardy has presented uncontroverted evidence that his assistant handles his mail and forwards it to the appropriate department to handle, meaning that Hardy would not have received Sharif's letter and thus cannot have known of the alleged unconstitutional violation.[13]  *See Keller*, 496 F. App'x at 667; *Johnson*, 444 F.3d at 584.  Thus, the Court grants summary judgment for Hardy.

### 2.    Edwards

Sharif claims that Edwards exhibited deliberate indifference to Sharif's medical needs in refusing Sharif's request to be moved to a lower gallery cell in October 2011.  In October 2011, Sharif encountered Edwards and asked to be moved to a lower gallery, despite at the time not having a low gallery permit.  Edwards offered to move him to F House, but Sharif did not accept this offer because he believed it would involve the same issue he had in his current block of going up and down stairs and he did not want to transfer to F House, which housed segregation inmates.

Sharif contends that a disputed issue of fact exists because Edwards' response of offering to put Sharif in F House instead of accommodating his "reasonable medical request" constituted punishment and was "motivated by malice."  Doc. 175 at 22.  But several problems exist with Sharif's claims.  First, Sharif has not shown that Edwards had any responsibility for bunk

---

[13] Even proceeding as if Hardy had received the May 2012 letter, Sharif has provided no evidence that, had Hardy investigated at that time, he would have found that Sharif was receiving constitutionally deficient care.  *See Riley El v. Godinez*, No. 13 C 5768, 2016 WL 4505038, at *15 (N.D. Ill. Aug. 29, 2016) (plaintiff's claim that non-medical defendants failed to investigate and intervene in his medical treatment failed where plaintiff received constitutionally adequate medical care); *Coleman v. Hardy*, No. 12 C 03842, 2014 WL 4911305, at *5 (N.D. Ill. Sept. 30, 2014) (even if defendants had received letters plaintiff claimed to have sent, plaintiff presented no evidence that care he received fell below professional standards to support claim of deliberate indifference).  Sharif does not present evidence suggesting that he received inadequate care at that time, when the medical records specialist testified that after Wexford approved the surgery on April 9, Dr. Puppala requested an additional appointment and x-rays before surgery.  Thus, Sharif required an additional follow-up appointment at the request of the specialist, which occurred on June 5 and at which Dr. Puppala determined Sharif did not need surgery.  Only after a further CT scan did Dr. Puppala decide to perform surgery.

assignments.  *See Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 427 (7th Cir. 2017)

(finding summary judgment appropriately granted for defendants where, among other things,

defendants were not responsible for bunk assignments).  Second, Sharif admits that at the time he

spoke to Edwards, he did not have a low gallery permit.  Finally, his claims of hostility or

punishment are not supported by the record.  Instead, the evidence demonstrates that Edwards

provided Sharif with a reasonable option to move in response to his request.  The fact that Sharif

found the accommodations in F House undesirable and so refused to take advantage of them

does not create a genuine issue of fact as to whether Edwards demonstrated deliberate

indifference to Sharif's serious medical needs.  *See Long v. Steepro*, 27 F. App'x 625, 627 (7th

Cir. 2001) (prison officials could not be held liable for disregarding risk to inmate's safety where

they offered to place inmate in protective custody and inmate refused, noting that "[o]fficials

who take reasonable steps to prevent harm to a prisoner cannot be held liable for subsequent

injuries, even if the harm is not averted").  Sharif has not pointed to evidence in the record of any

harm that resulted from Edwards not transferring him to a different gallery, or, for that matter,

that he did not end up on a low gallery thereafter.  Thus, the Court grants summary judgment for

Edwards.

### 3.      Brown-Reed

Finally, Sharif claims that Brown-Reed, as the health care unit administrator, exhibited

deliberate indifference when she failed to act on any of Sharif's complaints of pain, which he

claims she learned of through his letters to her and observing his January 20, 2012 appointment

with Williams.  Sharif also appears to suggest in his response that Brown-Reed should have been

aware of his condition and treatment because, as the health care unit administrator, she oversaw

the grievance process as it related to the health care unit, but the evidence in the record indicates

that Brown-Reed did not conduct investigations into inmate complaints or review treatment plans, and Sharif does not point to any particular grievances that Brown-Reed reviewed. Thus, Sharif cannot rely on Brown-Reed's alleged role in the grievance process to create a genuine issue of fact here.

As for the April 20 and 29 and September 5 letters Sharif allegedly sent Brown-Reed, she has testified that she never personally reviewed letters sent to her by inmates. Additionally, she indicated that letters received by her office were stamped and that none of the letters Sharif claims to have sent her bear stamps from her office, suggesting that they were not received. Because the evidence in the record establishes that Brown-Reed did not receive Sharif's letters and so did not have knowledge of the issues raised in those letters, Sharif cannot establish her deliberate indifference through these letters.[14]

Finally, although Brown-Reed does not recall being present during Sharif's January 20 appointment with Williams, assuming that she was, Sharif does not explain how her presence at that appointment supports a finding of deliberate indifference. While this appointment would have placed her on notice of Sharif's ankle problem at the time, Williams scheduled Sharif for a follow up appointment with Dr. Carter during that visit, and that follow up occurred on January 25, only a few days later. Brown-Reed was entitled to rely on the treatment decisions made by the medical professionals in addressing Sharif's ankle, knowing, on January 20, that Sharif would soon be seen by a doctor to address the fact that his ankle remained fractured. Sharif fails to point to anything suggesting that she should have taken additional steps to address his ankle

---

[14] As addressed above with respect to Hardy, even if the Court found a question of fact on whether Brown-Reed received these letters, Sharif has provided no evidence that, had Brown-Reed investigated Sharif's care after receiving the April 2012 letters, she would have found that Sharif was receiving constitutionally deficient care. *See supra* n.13. As for the September 5 letter, Sharif does not develop evidence as to his treatment at Wexford post-surgery, so the Court cannot opine on what Brown-Reed would have found had she investigated. Because there is no question of fact as to Brown-Reed's knowledge at this stage, the Court need not address the issue.

injury at that time.  *See Shaw v. Wexford Health Sources, Inc.*, No. 13-cv-09335, 2017 WL 131585, at *5 (N.D. Ill. Jan. 13, 2017) (granting summary judgment for Brown-Reed on deliberate indifference claim where plaintiff did not show that Brown-Reed "had the obligation to speed up [plaintiff's] physical therapy, or that she was not entitled to rely on the decisions that had been made by medical professionals").  Therefore, the Court grants summary judgment for Brown-Reed.

## CONCLUSION

For the foregoing reasons, the Court grants the Wexford Defendants' motion for summary judgment [158] and the IDOC Defendants' motion for summary judgment [161].  The Court enters judgment for the Wexford and IDOC Defendants and terminates this case.

Dated: August 8, 2017

SARA L. ELLIS
United States District Judge